UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| WILFORD PHELPS,<br><br>                    Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY<br>ADMINISTRATION,<br><br>                    Defendant. | CASE NO. 1:21-CV-02295-BYP<br><br>JUDGE BENITA Y. PEARSON<br><br>MAGISTRATE JUDGE DARRELL A. CLAY<br><br>**REPORT AND RECOMMENDATION** |

**INTRODUCTION**

Plaintiff Wilford Phelps filed a Complaint against the Commissioner of Social Security (Commissioner) seeking judicial review of the Commissioner's decision denying supplemental security income (SSI). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). On December 7, 2021, pursuant to Local Rule 72.2, this matter was referred to a Magistrate Judge for preparation of a Report and Recommendation and was subsequently reassigned to me pursuant to General Order 2022-03. (Non-document entry of February 2, 2022). Following review, and for the reasons stated below, I recommend the District Court **REVERSE** the Commissioner's decision and **REMAND** the case for additional proceedings consistent with this recommendation.

PROCEDURAL BACKGROUND

Mr. Phelps previously filed for SSI in 2015 and an Administrative Law Judge denied the application on December 12, 2017. (Tr. 129). That application considered the period of alleged disability beginning September 1, 2014, the onset date, to December 12, 2017, the date of denial.

Mr. Phelps applied again for SSI on January 3, 2018, alleging a disability onset date of June 4, 2015. (*Id.*). His claim was again denied initially and on reconsideration. (Tr. 149, 163). He then requested a hearing before an ALJ. (Tr. 207-09). Mr. Phelps, represented by counsel, and a vocational expert (VE) testified at hearings before the ALJ on June 19, 2019, and September 10, 2019. (Tr. 92-125, 62-91). On October 1, 2019, the ALJ issued a written decision finding Mr. Phelps not disabled. (Tr. 167-86).

On July 27, 2020, the Appeals Council vacated the ALJ's decision and remanded the matter to the ALJ for resolution of four issues. (Tr. 189-91). First, the Appeals Council determined the decision was "unclear regarding the nature and severity of [Mr. Phelps'] mental impairments and [his] work-related limitations, as it indicates 'severe' mental impairments, yet contains vague and ill-defined mental work-related limitations in the residual functional capacity." (Tr. 189). Second, the Appeals Council found the ALJ did not perform an adequate evaluation of the severity or effects of Mr. Phelps' mental health impairments. (Tr. 189-90). Third, the ALJ was further instructed to address Mr. Phelps' need for an assistive device, which the Appeals Council noted "appears supported by the medical evidence of record." (Tr. 190) ("In April 2016, David Margolius, M.D., the claimant's primary care physician, prescribed a cane due to claimant's back pain. Clinical signs show a slow/antalgic gait and ambulation with a cane. These medical findings are consistent with symptoms, including balance problems, clinical signs seen during the period at

issue, despite medication and physical therapy treatment.") (citations omitted). Finally, the Appeals Council found the ALJ's decision contained inconsistent conclusions and findings concerning the nature and severity of Mr. Phelps' right shoulder impairment. (*Id.*). The Appeals Council noted the ALJ found the right shoulder rotator cuff tear to be a severe impairment, which was supported by moderate acromioclavicular degenerative arthrosis and an anterosuperior labral tear with adjacent paralabral cyst, and clinical signs, which show reduced range of motion in the right upper extremity, and despite these findings in the record the ALJ offered no work-related shoulder limitations, necessitating further evaluation. (*Id.*).

Following the remand order, Mr. Phelps, represented by counsel, and VE Diane Regan testified at a hearing on November 16, 2020. (Tr. 35-61). Mr. Phelps amended the date of disability onset from June 1, 2015, to January 3, 2018, the date he filed this application for SSI. (Tr. 16). On December 8, 2020, the ALJ issued a decision finding Mr. Phelps not disabled. (Tr. 13-29). The Appeals Council denied review, making the hearing decision the final decision of the Commissioner. (Tr. 1-3; *see* 20 C.F.R. §§ 416.1455, 416.1481). Mr. Phelps timely filed this action on December 7, 2021. (ECF #1).

FACTUAL BACKGROUND

I.   PERSONAL AND VOCATIONAL EVIDENCE

Mr. Phelps was 48 years old at the time of his alleged onset date, and 50 years old at the time of the most recent administrative hearing. (Tr. 42, 152). Mr. Phelps completed tenth grade. (Tr. 406). In the past, Mr. Phelps has been employed as a production assembler, press operator, and material handler. (Tr. 27).

II.    RELEVANT MEDICAL EVIDENCE

Mr. Phelps has a history of back pain stemming from a 2014 car accident. (Tr. 576). A February 2016 x-ray of the lumbar spine revealed mild scoliosis, without significant disc space narrowing. (Tr. 576). Mr. Phelps was prescribed gabapentin and ibuprofen 800mg for pain. (*Id.*). In 2016, David Margolius, M.D., prescribed a cane to address Mr. Phelps' back pain with prolonged bending and standing, and balance issues. (Tr. 489, 523-25). Since then, medical professionals noted Mr. Phelps' abnormal gait, describing it as very slow and/or antalgic, even with his cane. (Tr. 473, 475, 477, 483, 522, 525, 530, 533, 545, 577, 605, 622, 846, 856). Physical examinations with various providers related to his back pain (including primary care and pain management) have revealed pertinent objective findings, including:

- abnormal muscle tone with weakness and decreased muscle bulk in the bilateral legs (Tr. 478);

- tenderness to palpation of the bilateral paraspinal muscles of the lower thoracic and lumber spine and decreased range of motion at flexion and extension (Tr. 553);

- musculoskeletal tenderness, positive facet loading, and tenderness to palpation over lumbar paraspinal muscles and lumbar facets (Tr. 577);

- restricted spinal range of motion (Tr. 605);

- positive facet loading, tenderness to palpation over the lumbar paraspinal muscles and the lumbar facets, and weakness of the right lower extremity with hip flexion and knee extension (Tr. 822); and

- positive facet loading, tenderness to palpation of the cervical, thoracic, and lumbar paraspinal muscles, and tenderness to palpation of the lumbar facets (Tr. 832).

A lumbar spine x-ray from March 2019 revealed mild osseous endplate spurring at L3 through L5 and mild degenerative facet arthrosis at L5-S1. (Tr. 583). In April 2019, an MRI of Mr.

Phelps' lumbar spine showed a loss of disc space height and signal intensity at L5-S1 with a diffuse disc bulge with some encroachment into the anterior cerebrospinal fluid space and a small annular fissure. (Tr. 827).

For pain management, Mr. Phelps has undergone several back injections, including an interlaminar epidural steroid injection in April 2019 (Tr. 821), a medial branch block in May 2019 (Tr. 831), and a bilateral transforaminal epidural steroid injection in July 2019 (Tr. 837). Mr. Phelps endorsed some improvement in the severity of pain after the injections, but the relief was temporary. (Tr. 839-40). At the end of 2018, Mr. Phelps' medications consisted of gabapentin 800 mg three times a day and ibuprofen 800 mg two times a day. (Tr. 441). In August 2019, Mr. Phelps' doctor ordered a TENS unit for back pain and discussed trigger point injection therapy as a potential treatment in the future. (Tr. 841). By August 2020, Mr. Phelps was taking gabapentin 800 mg three times a day and diclofenac 75 mg two times a day for pain, tizanidine 75 mg (a muscle relaxer) once a day, duloxetine 60 mg once a day for depression, and trazadone 100 mg twice a day for sleep. (Tr. 463).

Mr. Phelps attended five physical therapy sessions for his back pain in March and April 2019. He stated the back exercises increased his low back pain and right leg numbness. (Tr. 605-11). He was transferred to water therapy. (Tr. 611).

In January 2019, Mr. Phelps injured his right shoulder. He presented to the emergency department on February 11, 2019, with continued pain. (Tr. 585-87). Evaluation was consistent with a biceps muscle tendon disruption. (Tr. 586). Mr. Phelps received a sling and anti-inflammatory medication. (*Id.*).

5

On February 15, 2019, Mr. Phelps met with Brian Victoroff, M.D., for his shoulder. (Tr. 589). Dr. Victoroff determined Mr. Phelps suffered a proximal biceps partial rupture. (*Id.*). He recommended physical therapy, anti-inflammatories, and tramadol for pain. (*Id.*).

On March 4, 2019, Mr. Phelps met with Adam Schell, M.D., an orthopedic surgeon, for a second opinion. (Tr. 569). Dr. Schell noted tenderness to palpation over the biceps muscle and concluded he had a strained right biceps muscle. (Tr. 570). Mr. Phelps was referred for physical therapy for the biceps strain and told to return in two or three weeks if symptoms did not improve with therapy. (*Id.*). During the initial physical therapy evaluation on March 6, 2019, the therapist noted severe tenderness to palpation of the right bicep muscle belly and right bicep tendon, limited elbow extension and supination, normal wrist range of motion, decreased strength in the right shoulder, and significantly decreased grip strength on the right side (22 on the right compared to 95 on the left). (Tr. 601). Mr. Phelps was able to complete a second physical therapy session with difficulty but agreed with his therapist to discontinue therapy until he completed an MRI of his shoulder. (Tr. 603).

Mr. Phelps had the MRI on March 20, 2019, which revealed a paralabral cyst adjacent to the anterosuperior labrum, "indicating an underlying labral tear" and degenerative fraying at the superior labrum. (Tr. 591). The MRI also showed moderate acromioclavicular degenerative arthrosis with effusion and capsular thickening, "which together narrow the subacromial space and rotator interval," and an intraosseous scapular lesion. (*Id.*). On April 12, 2019, Mr. Phelps resumed shoulder-related physical therapy after receiving an injection into his right shoulder and feeling some improvement. (Tr. 610).

6

### III.   MEDICAL OPINIONS

On May 5, 2018, Leon D. Hughes, M.D., a state agency medical consultant, determined Mr. Phelps was not disabled. As a state agency medical consultant, Dr. Hughes did not observe or treat Mr. Phelps, but undertook a review of Mr. Phelps' medical records only. According to the administrative record, Dr. Hughes reviewed only the following: the findings and opinion of Eulogio Sioson, M.D., who examined Mr. Phelps in February 2016 and noted some decreased strength in the bilateral shoulders, limited bilateral range of motion in the bilateral shoulders and knees, a spinal x-ray showing mild scoliosis and no significant disc space narrowing and opined, "In summary, there were no objective findings that would significantly affect walking, standing, sitting, lifting, carrying, handling but if one considers limitation of range of motion from pain, and above findings, work-related activities could be limited to light work." (Tr. 145). Dr. Hughes also noted a medical record entry from a November 2017 follow-up appointment showed Mr. Phelps walks slowly with a single prong cane, and the ALJ's decision from December 12, 2017 that concluded Mr. Phelps could perform the full range of light work.[1] (Tr. 145-46). Dr. Hughes did not opine any additional functional limitations, but adopted the former ALJ's RFC. (Tr. 147-48).

On June 4, 2018, Dr. Margolius completed a medical source statement and offered his opinion as to Mr. Phelps' residual functional capacity. (Tr. 513-14). Based on Mr. Phelps' back pain as a result of scoliosis and degenerative discs, he can occasionally lift ten pounds, three pounds frequently; can stand and walk for a total of one hour a day; can sit for a total of four

---

[1]     Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full range of light work, you must have the ability to do substantially all of these activities. 20 C.F.R. § 416.967(b).

hours a day; and can rarely climb, balance, stoop, crouch, kneel, and crawl. (Tr. 513). In addition, Dr. Margolius determined Mr. Phelps can rarely reach, push and pull, and perform activities requiring gross manipulation but can occasionally perform activities requiring fine manipulation; needs to be able to alternate between sitting, standing, and walking positions at will; and experiences severe pain that interferes with Mr. Phelps' concentration, takes him off task, and would cause absenteeism. (Tr. 514). Dr. Margolius also acknowledged Mr. Phelps' prescription for a cane. (*Id.*).

On June 20, 2018, Venkatachala Sreenivas, M.D., another state agency medical consultant, also adopted the RFC the ALJ crated in the December 12, 2017 decision. (Tr. 160). As did Dr. Hughes, Dr. Sreenivas reviewed medical records only. Dr. Sreenivas noted that a physical examination in August 2017 showed "[abnormal] muscle tone, weakness, and decreased bulk in the [bilateral lower extremities], which supports [the] use of [a] cane," and thus Mr. Phelps may have some limitations in walking. (Tr. 158). In reviewing Dr. Margolius' opinion, Dr. Sreenivas determined the opinion was not fully supported by the medical evidence of record:

> [Mr. Phelps] does have some limitations, which necessitates [the] use of a cane; however, coordination and reflexes are intact. Sensory is intact. There is no clinical evidence showing any [bilateral upper extremity] problems nor does he have a condition that would cause such limitations in functioning to the extent [Mr. Phelps] is alleging.

(Tr. 159). Before the ALJ issued her December 2020 decision, she was the only person in the administrative process to have reviewed the medical evidence post-dating Dr. Sreenivas' disability determination.

## IV.    ADMINISTRATIVE HEARING

During the hearing before the ALJ, Mr. Phelps testified that he has worked in the past as a health aide, a production assembler, a press operator, and a material handler, but has not worked since January 2018. (Tr. 42, 104). He testified he cannot work because of his lower back and nerve pain, both of which make it difficult to bend or stand and walk for more than short periods of time. (*Id.*). He has used a cane for walking and for balance since 2016. (Tr. 109-10). He uses the cane in his left hand. (Tr. 43). Lifting more than five pounds increases his low back pain. (Tr. 109). In addition to back pain, Mr. Phelps endured a right arm injury, for which he received therapy and injections, that causes pain when reaching overhead. (Tr. 107-08). He also described pain with reaching in front of him with his right arm. (Tr. 77). Mr. Phelps described feeling depressed because he used to take care of himself but now must rely on others for help. (Tr. 104). Even with medication, Mr. Phelps has days where his pain is such that he stays inside his apartment and closes the blinds. (Tr. 105).

Mr. Phelps does not drive, relying instead on his daughter for rides or taking the bus. (Tr. 111). He leaves the house to attend therapy and medical appointments, and occasionally goes to the grocery store. (Tr. 111-12). He does not engage in activities outside of the home, such as church or organization membership. (Tr. 112). He does not socialize, other than to visit his mother in a nursing home every two weeks during the summer, because his pain makes him irritable and makes him "snap[] at people." (*Id.*). Mr. Phelps can make his own meals, but the process takes time because he can only stand for five or ten minutes before he feels shooting pain down his right leg and needs to sit down. (*Id.*). His daughter comes over once a week to help with the laundry. (Tr. 71).

Mr. Phelps testified he does home exercises twice a day to relieve the stiffness in his back. (Tr. 112). At the time of the hearing, Mr. Phelps testified to taking gabapentin for pain and duloxetine for depression. (Tr. 72). Mr. Phelps stated the medication helps with the depressive symptoms and he feels more relaxed and less prone to excessive worry. (*Id.*). Gabapentin, which he takes three times a day, causes drowsiness, so Mr. Phelps typically takes naps. (Tr. 73). Mr. Phelps does not take the medication if he has to leave the house. (Tr. 75). Mr. Phelps also uses a TENS unit every day for back pain. (Tr. 73).

VE Diane Regan then testified.

**Hypothetical One.** The ALJ asked the VE whether a hypothetical individual of the same age, education, and work experience as Mr. Phelps could perform his past relevant work if subject to light exertional work without other limitations. (Tr. 51). The VE responded such an individual could perform Mr. Phelps' past relevant work as a production assembler and a press operator. (*Id.*).

**Hypothetical Two.** If additionally limited to occasionally pushing and pulling with the right upper extremity; no climbing of ladders, ropes, or scaffolds; restricted from working at unprotected heights or operating dangerous moving equipment such as power saws and jackhammers; can understand, remember, and carry out simple instructions; can maintain concentration, persistence, and pace for simple routine type tasks; no piece rate type work; can interact with others for brief and superficial tasks identified, for example, as asking questions, clarifying instructions, gathering information, service, and pointing where items should be placed, the hypothetical individual would be unable to perform Mr. Phelps' past relevant work. (Tr. 52). However, the VE testified the hypothetical individual could perform other work as a packer (Dictionary of Occupational Title (DOT) #559.687-074, 100,000 jobs), sorter (DOT #788.687-

10

106, 100,000 jobs), or assembler (DOT #729.687-010; 200,000 jobs), all light exertion, unskilled positions. (*Id.*).

Before the ALJ offered another set of restrictions for the VE's consideration, she acknowledged the Appeals Council's instruction to address the need for an assistive device. (Tr. 53). The ALJ stated as follows:

> I do not see the medical necessity for a cane. It showed an x-ray that only had mild L3-L5 endplate spondylosis and mild degenerative arthrosis. The fact the claimant uses one is not in my opinion synonymous with the medical necessity. Now, I do recognize that the physician made note of it and documented it in his file the claimant came to his office using a cane, but I don't see where there would be the medical necessity. [H]is records do not document an appropriate musculoskeletal examination or an evaluation of muscle strength, range of motion, or tone. Instead, he simply documents that the claimant is walking with a cane and has a slow gait. This is not sufficient documentation to support a conclusion that a cane is medically necessary for standing or walking as alleged especially when the diagnostic tests and the x-ray that I referenced showed only mild degenerative facet arthrosis.

(Tr. 53) (cleaned up).

**Hypothetical Three.** To the second hypothetical, the ALJ added a limitation that the individual would use a cane when ambulating on uneven surfaces and outdoors, such as terrain, ground, and lawn. (Tr. 54). The VE testified such an individual could perform the other positions identified. (Tr. 54).

**Hypothetical Four.** The ALJ then asked the VE if a hypothetical individual could perform any of the previously identified jobs if restricted as follows: No climbing ladders, ropes, or scaffolds; no crawling, but can frequently climb ramps and stairs, balance, stoop, kneel, bend, crouch, and crawl; limited to occasional reaching in all directions with the right upper extremity; no work at unprotected heights or operating dangerous moving equipment such as power saws and jackhammers; can understand, remember, and carry out simple instructions; can maintain

11

concentration, persistence, and pace for simple routine type tasks, but no piece rate type work; can interact with others for brief and superficial tasks identified, for example, asking questions, clarifying instructions, gathering information, serving, and pointing where items should be placed. (Tr. 54-55). After the ALJ clarified that "brief and superficial" means the job is limited to providing short responses to people, the VE testified such an individual could perform work as a greeter (DOT #344.667-014, 25,000 jobs) and a ticket taker (DOT #344.667-010, 30,000 jobs). (Tr. 56).

**Hypothetical Five.** Lastly, the ALJ asked if a hypothetical individual could perform any of the identified jobs if limited to light exertion; occasional push/pull with the right dominant upper extremity, up to occasional overhead reaching with the right upper extremity; no climbing ladders, ropes, or scaffolds; no crawling; all other postural limitations can be performed frequently; no work in unprotected heights or operating dangerous moving equipment such as power saws and jackhammers; can understand, remember, and carry out simple instructions; can maintain concentration, persistence, and pace for simple routine type tasks; no piece rate type work; can interact with others for brief and superficial tasks identified, for example, as asking questions, clarifying instructions, gathering information, serving others, and pointing where items should be placed. (Tr. 57). The VE testified such a person could perform the previously identified positions of packer, sorter, and assembler. (Tr. 58).

Mr. Phelps' counsel then cross examined the VE. If, in addition to limitations to brief and superficial contact, the hypothetical individual was further restricted to occasional interaction with others, the individual would be unable to perform work as a greeter or ticket taker. (*Id.*). Considering **Hypothetical Two,** if an individual needed to alternate between sitting and standing (20 minutes standing, 3-4 minutes of rest), the number of packer, sorter, and assembler jobs in the

national economy would be reduced by half; moreover, such an individual would be unable to perform the greeter and ticket taker positions. (Tr. 59). If an individual was restricted as in **Hypothetical Two** and required a cane for all ambulation and for standing in place, the individual would be unable to perform work as a packer, sorter, or assembler, but could perform work as a greeter or ticket taker. (Tr. 60). The VE also stated employers tolerate only up to 15% off-task time. (*Id.*).

## THE ALJ'S DECISION

The ALJ's decision, dated December 8, 2020, included the following findings of fact and conclusions of law:

1. The claimant has not engaged in substantial gainful activity since January 3, 2018, the application date/amended onset date (20 CFR 416.971 *et seq.*).

2. The claimant has the following severe impairments: lumbar degenerative disc disease, degenerative joint disease and partial rotator cuff tear in the right shoulder, and an adjustment disorder with depressed mood (20 CFR 416.920(c)).

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925, and 416.926).

4. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except he can occasionally push and pull with the right dominant upper extremity, and except he can occasionally reach overhead with the right upper extremity. While the claimant has no limitations with respect to his left upper extremity, his residual functional capacity has been further reduced in that he cannot crawl or climb ladders, ropes, or scaffolds (all other postural activities can be performed up to frequently). The claimant also cannot work on unprotected heights or operate dangerous moving equipment such as power saws and jackhammers. Mentally, the claimant can understand, remember, and carry out simple instructions. He can also maintain concentration, persistence, and pace for simple, routine-type tasks but he cannot perform piece-rate

type work. The claimant can also interact with others for brief and superficial tasks such as asking questions, clarifying instructions, gathering information, serving others, and pointing where items should be placed. (Cleaned up).

5.      The claimant is unable to perform any past relevant work (20 CFR 416.965).

6.      The claimant was a younger individual in the "45 to 49" age group on the amended January 3, 2018 alleged onset date, and he has been considered to be a person closely approaching advanced age since April 26, 2020 (20 CFR 416.963).

7.      The claimant has a limited education (20 CFR 416.964).

8.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

9.      Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969, and 416.969a).

10.     The claimant has not been under a disability, as defined in the Social Security Act, since January 3, 2018, the date the new application was filed (20 CFR 416.920(g)).

(Tr. 16-29).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health &*

14

*Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

In determining whether the Commissioner's findings are supported by substantial evidence, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler,* 730 F.2d 1147, 1150 (8th Cir. 1984)).

However, "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Social Security,* 531 F. App'x 636, 641 (6th Cir. 2013) (cleaned up).

A district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted). Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not observe its own procedures

and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546–47 (6th Cir. 2004).

### STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 416.920—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.*

Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. § 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

**DISCUSSION**

Mr. Phelps challenges the ALJ's residual functional capacity assessment. First, he claims the ALJ's determination of his residual functional capacity is based only on the ALJ's own medical conclusions and not on any medical opinions. (Pl.'s Br., ECF #9, PageID 995). Within this argument, Mr. Phelps asserts the ALJ failed to fulfill her duty to develop the record by, for instance, ordering a consultative physical examination, citing *Deskin v. Comm'r of Soc. Sec.*, 605 F. Supp. 2d 908 (N.D. Ohio Mar. 31, 2008). (*Id.*).

In response, the Commissioner asserts the ALJ's residual functional capacity assessment is supported by substantial evidence; moreover, the ALJ's decision reflected the findings of the reviewing physicians, but found further limitations were warranted based on the record and discussed the evidence supporting those limitations. (Comm'r's Br., ECF #10, PageID 1018, 1020).

A claimant's residual functional capacity is the most the claimant can do despite his limitations. 20 C.F.R. § 416.945(a)(1).  It is the ALJ's responsibility to assess a claimant's residual functional capacity, an assessment that must be made based on all the relevant evidence in the record. *Id.* at § 416.945(a)(1); *see also id.* at  § 416.946(c). The claimant is responsible for providing evidence to prove disability and must inform the ALJ of additional related evidence of which he later becomes aware. *Id.* at § 416.912(a)(1). The ALJ has a basic obligation to develop a full and fair record. *Lashley v. Sec'y of Health & Human Servs.*, 708 F.2d 1048, 1051 (6th Cir. 1983).

17

In *Deskin*, the court reviewed a record containing one medical opinion from a state agency reviewing physician who reviewed the record two years before the ALJ made an RFC finding without the benefit of two years' worth of medical records. 605 F. Supp. 2d 908. The *Deskin* court set forth the following rule:

> [When] the transcript contains only diagnostic evidence and no opinion from a medical source about functional limitations (or only an outdated nonexamining agency opinion), to fulfill the responsibility to develop a complete record, the ALJ must recontact the treating source, order a consultative examination, or have a medical expert testify at the hearing. This responsibility can be satisfied without such opinion only in a limited number of cases [in which] the medical evidence shows "relatively little physical impairment" and an ALJ "can render a commonsense judgment about functional capacity."

*Id.* at 912 (citations omitted).

Subsequently, in *Kizys v. Comm'r of Soc. Sec.*, No. 3:10 CV 25, 2011 WL 5024866 (N.D. Ohio Oct. 21, 2011), the court clarified that *Deskin* potentially applies in only two circumstances: when an ALJ made an RFC determination based on no medical source opinion, or when an ALJ made an RFC based on an "outdated" medical source opinion "that does not include consideration of a critical body of objective medical evidence." *Id.* at *2. Where an ALJ has opinions that account for the majority of the medical evidence, an ALJ may reasonably make judgments on the supportability and consistency of the medical opinions and can adopt residual functional capacity accordingly. *Id.* However, "where a 'critical body' of the 'objective medical evidence' is not accounted for by a medical opinion and there is significant evidence of potentially disabling conditions, the ALJ should develop the record by obtaining opinion evidence that accounts for the entire relevant period." *McCauley v. Comm'r of Soc. Sec.*, No. 3:20 CV 13069, 2021 WL 5871527, at *14–15 (E.D. Mich. Nov. 17, 2021), *report and recommendation adopted*, No. 20-CV-

18

13069, 2021 WL 5867347 (E.D. Mich. Dec. 10, 2021) (citing *Branscum v. Berryhill*, No. 6:17-CV-345, 2019 WL 475013, at *11 (E.D. Ky. Feb. 6, 2019)).

Here, the record contains three medical opinions: one from Dr. Hughes dated May 5, 2018; one from Dr. Margolius on June 4, 2018; and one from Dr. Sreenivas dated June 20, 2018. However, Mr. Phelps provided medical records related to his physical impairments through October 2019 that were not considered by the state agency consultants. This body of evidence contains numerous examples of Mr. Phelps' ongoing symptoms and diagnostic tests, including symptoms and diagnostic tests the ALJ insists are not in the record. For instance, the ALJ claims the record does not contain any evidence of muscle atrophy, restricted spinal motion, or loss of muscle strength. (Tr. 16, 23). But the record plainly contains such clinical findings and other relevant clinical findings the ALJ did not acknowledge. (*See* Tr. 478, 553, 577, 605, 822, 832).

Notably, the ALJ made clear that the lack of MRI testing weighed heavily in rejecting Mr. Phelps' claim that his symptoms have caused additional or greater work-related limitations: "It is significant and persuasive to me that the claimant's back problems have not been further investigated with magnetic resonance imagine as one would expect if the claimant had symptoms that were of a disabling nature." (Tr. 23-24). Again, the record contains the results of MRI imaging, which show a slight loss of disc space and signal intensity, and a diffuse disc bulge with minimal encroachment at the anterior cerebrospinal fluid space. (*See* Tr. 827). The ALJ's apparent inaccurate assessment of the medical record is concerning and indicative of a less than careful review. In addition, the ALJ's assessment of Mr. Phelps' upper extremity limitation is necessarily her own medical opinion about the limitations imposed by his impairments because she is the only one to have reviewed the relevant medical records, the earliest of which post-dates the medical

opinions. Therefore, I conclude the ALJ's residual functional capacity assessment is based on an "outdated" medical source opinion "that does not include consideration of a critical body of objective medical evidence." *See Kizys,* 2011 WL 5024866 at *2.

Applying the *Deskin* rule, the ALJ's responsibility to develop the record can be satisfied without a medical opinion that addresses the "critical body of objective evidence" only in a limited number of cases in which the medical evidence shows relatively little physical impairment and an ALJ can render a commonsense judgment about functional capacity. This case does not fit into the exception. To the contrary, despite participating in physical therapy and taking several different pain medications, Mr. Phelps continues to have pain and difficulty with reaching overhead and in front with his right arm. (Tr. 77). Mr. Phelps's shoulder MRI revealed a paralabral cyst adjacent to the anterosuperior labrum, "indicating an underlying labral tear" and degenerative fraying at the superior labrum. (Tr. 591). The MRI also showed moderate acromioclavicular degenerative arthrosis with effusion and capsular thickening, "which together narrow the subacromial space and rotator interval," and additionally noted the presence of an intraosseous scapular lesion. (*Id.*). Without the benefit of any medical opinion, the ALJ included limitations for pushing, pulling, and overhead reaching with the right upper extremity, and in doing so made a medical judgment concerning the limitations that could be expected in light of those findings. It is well established that courts and ALJs are "generally unqualified to interpret raw medical data and make medical judgments concerning the limitations that may reasonably be expected to accompany such data." *Alexander v. Kijakazi,* No. 1:20-cv-01549, 2021 WL 4459700, at *9 (N.D. Ohio Sept. 29, 2021) (collecting cases); *see also Fergus v. Comm'r of Soc. Sec.,* No. 5:20-CV-02612-CEH, 2022 WL 743487, at *11 (N.D. Ohio Mar. 11, 2022). While Mr. Phelps' diagnostic imaging and treatment records

20

"may appear minimal to the lay person, the ALJ was not qualified to translate this medical data into functional capacity determinations." *Mabra v. Comm'r of Soc. Sec.*, No. 2:11-cv-00407, 2021 WL 2319245, at *9 (S.D. Ohio Jun. 19, 2012), *report and recommendation adopted*, 2012 WL 3600127 (S.D. Ohio Aug. 21, 2012).

Instead of fulfilling her obligation to develop the record fully by soliciting the opinion of a medical expert, ordering an additional consultative examination, or sending the full record back to the State agency reviewers for an updated assessment, the ALJ failed to consider the evidence post-dating the medical opinions. Moreover, the ALJ based Mr. Phelps' residual functional capacity on the ALJ's own interpretation of raw medical data and the limitations expected to accompany such data. As a result, I recommend the Court find the ALJ's residual functional capacity determination not properly supported by substantial evidence and remand for further proceedings to obtain a qualified opinion evidence that relates to the entire relevant period. *See McCauley*, 2021 WL 5871527 at *14–15.

Mr. Phelps also argued the ALJ erred in finding a cane was not medically necessary and thus was not warranted as an exertional limitation in the residual functional capacity assessment. The Sixth Circuit has explained that where a cane is "not a necessary device for the claimant's use, it cannot be considered an exertional limitation that reduced her ability to work." *Carreon v. Massanari*, 51 F. App'x 571, 575 (6th Cir. 2002). To find that a cane is medically required, there must be medical documentation establishing the need for a cane to aid in walking or standing, and describing the circumstances for which it is needed. SSR 96-9p.

Mr. Phelps claims the evidentiary record contains medical documentation establishing the need for a cane to aid in both walking and standing, pointing to Dr. Margolius' prescription for a

cane and multiple treatment records noting Mr. Phelps' slow and/or abnormal gait even while using a cane. (Pl.'s Br., ECF #9, PageID 997-98). However, I agree with the Commissioner that even if this constitutes medical documentation establishing the need for a cane, Mr. Phelps has failed to provide evidence describing the circumstances for which it is needed. (*See* Comm'r's Br., ECF #10, PageID 1022).

Though Mr. Phelps has not met his burden to show the cane is medically necessary such that an exertional limitation in the residual functional capacity is warranted, remand is still necessary because the ALJ did not adequately develop the record by obtaining additional opinion evidence that relates to the entire relevant period, and, moreover, engaged in making unqualified medical judgments about what limitations one would expect to find based on raw medical data. If further proceedings before the ALJ reveal additional evidence pertinent to whether a cane is medically necessary, the ALJ should re-evaluate whether Mr. Phelps meets the criteria.

### CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, I recommend the District Court **REVERSE** the Commissioner's decision denying supplemental security income and **REMAND** this matter for proceedings consistent with this recommendation.

Dated: November 15, 2022.

_____
DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

### OBJECTIONS, REVIEW, AND APPEAL

**Within 14 days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the Magistrate Judge.** *See* **Fed. R.**

Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal, either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the Report and Recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the Report and Recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the Magistrate Judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*, 932 F.2d at 509). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).